BROWNE GEORGE ROSS LLP
K.C. Maxwell (State Bar No. 214701)
   kmaxwell@bgrfirm.com
David S. Wakukawa (State Bar No. 262546)
   dwakukawa@bgrfirm.com
101 California Street, Suite 1225
San Francisco, CA  94111
Telephone: (415) 391-7100
Facsimile: (415) 391-7198
*Counsel for Plaintiffs and the Proposed Classes*

*[Additional Counsel Appear on Signature Page]*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JANET ACKERMAN, JOYCE GRANTZ, SCOTT HANSEN, JOSEPH HENDERSON, STEPHEN JUDGE, JOSEPH KOVACEVICH, GABRIELLE KURDT, LORI LANDES, KIRSTEN LUENZ, GEORGE MARUT, MICHELLE REYNOLDS, SETH SALENGER, ALAN SCHLAIKJER, LINDSAY SMITH, KATIE SMITH, JOHN SOLAK, ALLISON TRIPP, and LAUREL VENER, on behalf of themselves and all others similarly situated, | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| vs. | |
| QUALCOMM INCORPORED, a Delaware corporation, | |
| Defendant. | |

Plaintiffs Janet Ackerman, Joyce Grantz, Scott Hansen, Joseph Henderson, Stephen Judge, Joseph Kovacevich, Gabrielle Kurdt, Lori Landes, Kirsten Luenz, George Marut, Michelle Reynolds, Seth Salenger, Alan Schlaikjer, Lindsay Smith, Katie Smith, John Solak, Allison Tripp, and Laurel Vener, on behalf of themselves and all others similarly situated, upon personal knowledge as to the facts pertaining specifically to them, and upon information and belief as to all other matters, by and through their undersigned attorneys, bring this action for damages,

1    injunctive relief, and all other relief available under applicable law.

2                         **I.**        <u>**NATURE OF THE ACTION**</u>

3          1.      Qualcomm Incorporated ("Qualcomm") has built and maintained a monopoly over

4    the modem chipset market through abuse of intellectual property rights.  This anticompetitive

5    conduct has allowed Qualcomm to extract unlawful royalties from makers of cellular phones and

6    similar devices.  As a result, Plaintiffs and anyone who purchases such a device have paid inflated

7    prices.

8          2.      These modem chipsets (also known as "baseband processors") are required for

9    devices to communicate on cellular networks.  To ensure interoperability of devices, developers of

10   devices and device components collaborate through standard setting organizations ("SSOs") which

11   establish the standards to be used.  Any patent that is required in a standard is referred to as a

12   standard essential patent ("SEP").  Holders of SEPs are in an advantageous position because they

13   can obtain licensing fees and royalties associated with the use of their technology in the relevant

14   standards.  However, SEP holders can also use their position to restrict competitors' access to

15   technology that is essential to a standard, thereby stifling competition.  Because of this potential

16   for abuse, SSOs require SEP holders to agree to license their technology on fair, reasonable, and

17   nondiscriminatory ("FRAND" or "RAND") terms before patented technology is included in a

18   standard.

19         3.      Qualcomm is a dominant supplier of modem chipsets.  Qualcomm also licenses

20   patents that it has declared essential to widely adopted cellular standards.  Qualcomm has vowed

21   to SSOs that it will license its SEPs on FRAND terms.  Even when cellular phone manufacturers

22   (also known as "original equipment manufacturers" or "OEMs") incorporate modem chipsets

23   supplied by Qualcomm's competitors, they must still comply with standards which Qualcomm has

24   declared are covered by its patents.

25         4.      Rather than abiding by its FRAND term commitments, Qualcomm has exploited its

26   SEPs to build and maintain a monopoly over the modem chipset market.  Qualcomm built and

27   maintained this monopoly by engaging in a pattern of conduct, including:  (1) refusing to license

28

its SEPs to competing chipset makers, or imposing onerous restrictions in its licenses; (2) requiring agreement on Qualcomm's license agreements for its entire patent portfolio as a condition of supplying its CDMA chipsets; (3) obtaining exclusive deals with cellular phone manufacturers such as Apple Inc. ("Apple"); and (4) ignoring its FRAND term commitments and thereby extracting unreasonably high royalty payments.

5.     Whereas the common basis of a royalty for SEP technology is the value of the individual component containing that technology, Qualcomm insists on royalties that are based on the price of the finished device. This leads to Qualcomm extracting additional royalties even where its technology does not contribute to the increased price of a device. For example, the latest model iPhone, the iPhone 7, comes with three different storage capacity options:  32 GB, 128 GB, and 256 GB. These cost approximately $649, $749, and $849, respectively. Qualcomm's modem chipset has nothing to do with the increased price that comes with greater storage capacity. Nonetheless, absent an agreement providing Apple with relief from the royalty, Qualcomm would collect a larger royalty on the higher capacity models.

6.     Qualcomm coerces manufacturers to agree to its onerous royalty provisions through its "no-license-no-chips" policy wherein Qualcomm will not provide manufacturers with essential modem chipsets unless they agree to Qualcomm's licensing terms. Because Qualcomm's licensing terms also apply to cellular devices that do not use Qualcomm's modem chipsets, Qualcomm is thereby able to extract a "tax" from the entire cellular device manufacturing industry, thereby inflating prices for consumers.

7.     Qualcomm has also attempted to coercively dissuade cellular device manufacturers from providing accurate information to government regulatory authorities.

8.     Competition authorities around the world have condemned Qualcomm's conduct. Since 2009, the Japanese Fair Trade Commission ("JFTC"), the Chinese National Development & Reform Commission ("NDRC"), and the Korean Fair Trade Commission ("KFTC") have issued cease and desist orders or fines against Qualcomm.

9.     On January 17, 2017, the United States Federal Trade Commission ("FTC") filed a

1  complaint seeking to enjoin Qualcomm's unlawful maintenance of a monopoly in modem

2  chipsets.  See *Federal Trade Commission v. Qualcomm Inc.*, Case No. 5:17-cv-00220 (N.D. Cal.).

3      10.     Plaintiffs bring this action on behalf of themselves and others similarly situated to

4  recover for injuries caused by Qualcomm's violations of Sections 1 and 2 of the Sherman Act, as

5  well as violations of state antitrust and consumer protection statutes, and state common law.

6  Plaintiffs seek monetary damages, injunctive relief, and any other available remedies to which

7  they are entitled for Qualcomm's unlawful conduct.

8                    **II.    JURISDICTION AND VENUE**

9      11.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §

10  15, 26) to secure equitable and injunctive relief against Defendants for violating Sections 1 and 2

11  of the Sherman Act (15 U.S.C. § 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 3).  Plaintiffs

12  also bring claims for actual and exemplary damages and injunctive relief pursuant to state

13  antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover

14  damages, and secure all other available relief against Defendants for violation of those state laws.

15  Plaintiffs also seek attorneys' fees, costs, and other expenses under federal and state law.

16      12.     This Court has jurisdiction over the subject matter of this action pursuant to Section

17  16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title

18  28, United States Code, Sections 1331 and 1337.  This Court also has subject matter jurisdiction of

19  the state law claims pursuant to 28 U.S.C. § 1332(d) and 1367 in that: (i) this is a class action in

20  which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs,

21  and in which some members of the proposed Classes are citizens of a state different from some of

22  the Defendants; and (ii) Plaintiffs' state law claims form part of the same case or controversy as

23  their federal claims under Article III of the United States Constitution.

24      13.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15

25  U.S.C. § 22) and Title 28, United States Code, Section 1391(b)–(d), because a substantial part of

26  the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the

27  affected interstate trade and commerce discussed below has been carried out in this District, and

28

1  Defendant resides, is licensed to do business in, is doing business in, has agents in, or is found or

2  transact business in this District.

3       14.    In recent years, members of the proposes Classes purchased millions of cellular

4  devices at artificially inflated rates in this District.

5  **III.    INTRADISTRICT ASSIGNMENT**

6       15.    Pursuant to Northern District of California's Civil Local Rule 3-2(c)-(e), the

7  intradistrict assignment should be to the San Jose Division.  This action arises in Santa Clara

8  County because a substantial part of the events giving rise to these claims occurred in Santa Clara

9  County.  Qualcomm also has offices in Santa Clara and San Jose.  Third parties that have

10  information relevant to this action, including leading OEMs and Qualcomm competitors, also have

11  offices in Santa Clara County.  Further, the FTC filed a case in the San Jose Division concerning

12  the practices at issue here.

13  **IV.    PARTIES**

14      **A.    Plaintiffs**

15       16.    Plaintiff Janet Ackerman is a resident of Brooklyn, New York.  Plaintiff Ackerman

16  purchased an iPhone 6 (a Relevant Cellular Device as that term is defined below) for personal,

17  family, or household purposes and not for resale.

18       17.    Plaintiff Joyce Grantz is a resident of Welches, Oregon.  Plaintiff Grantz purchased

19  an iPhone 6 Plus (a Relevant Cellular Device as that term is defined below) for personal, family,

20  or household purposes and not for resale.

21       18.    Plaintiff Scott Hansen is a resident of Sullivan's Island, South Carolina.  Plaintiff

22  Hansen purchased an iPhone 6s (a Relevant Cellular Device as that term is defined below) for

23  personal, family, or household purposes and not for resale.

24       19.    Plaintiff Joseph Henderson is a resident of Minneapolis, MN.  Plaintiff Henderson

25  purchased an iPhone SE (a Relevant Cellular Device as that term is defined below) for personal,

26  family, or household purposes and not for resale.

27

28

1    20.    Plaintiff Stephen Judge is a resident of Rocky Mount, North Carolina.  Plaintiff

2  Judge purchased an iPhone 6s (a Relevant Cellular Device as that term is defined below) for

3  personal, family, or household purposes and not for resale.

4    21.    Plaintiff Joseph Kovacevich is a resident of Holmen, Wisconsin.  Plaintiff

5  Kovacevich purchased an iPhone 6s Plus (a Relevant Cellular Device as that term is defined

6  below) for personal, family, or household purposes and not for resale.

7    22.    Plaintiff Gabrielle Kurdt is a resident of Coxsackie, New York.  Plaintiff Kurdt

8  purchased an iPhone 6s (a Relevant Cellular Device as that term is defined below) for personal,

9  family, or household purposes and not for resale.

10    23.    Plaintiff Lori Landes is a resident of St. Louis, Missouri.  Plaintiff Landes

11  purchased an iPhone 6s (a Relevant Cellular Device as that term is defined below) for personal,

12  family, or household purposes and not for resale.

13    24.    Plaintiff Kirsten Luenz is a resident of Overland Park, Kansas.  Plaintiff Luenz

14  purchased an iPhone 7 (a Relevant Cellular Device as that term is defined below) for personal,

15  family, or household purposes and not for resale.

16    25.    Plaintiff George Marut is a resident of Wake Forest, North Carolina.  Plaintiff

17  Marut purchased an iPhone SE (a Relevant Cellular Device as that term is defined below) for

18  personal, family, or household purposes and not for resale.

19    26.    Plaintiff Michelle Reynolds is a resident of Traverse City, Michigan.  Plaintiff

20  Reynolds purchased an iPhone SE (a Relevant Cellular Device as that term is defined below) for

21  personal, family, or household purposes and not for resale.

22    27.    Plaintiff Seth Salenger is a resident of Minneapolis, Minnesota.  Plaintiff Salenger

23  purchased an iPhone 6s (a Relevant Cellular Device as that term is defined below) for personal,

24  family, or household purposes and not for resale.

25    28.    Plaintiff Alan Schlaikjer is a resident of Dell Rapids, South Dakota.  Plaintiff

26  Schlaikjer purchased an iPhone 6 (a Relevant Cellular Device as that term is defined below) for

27  personal, family, or household purposes and not for resale.

28

29.     Plaintiff Lindsay Smith is a resident of Oakland, Iowa.  Plaintiff Lindsay Smith purchased an iPhone 6 (a Relevant Cellular Device as that term is defined below) for personal, family, or household purposes and not for resale.

30.     Plaintiff Katie Smith is a resident of Bellevue, Nebraska.  Plaintiff Katie Smith purchased a Samsung Galaxy S6 (a Relevant Cellular Device as that term is defined below) for personal, family, or household purposes and not for resale.

31.     Plaintiff John Solak is a resident of Bible School Park, New York.  Plaintiff Solak purchased an iPhone 6s (a Relevant Cellular Device as that term is defined below) for personal, family, or household purposes and not for resale.

32.     Plaintiff Allison Tripp is a resident of Topeka, Kansas.  Plaintiff Tripp purchased a Samsung Galaxy S7 Edge (a Relevant Cellular Device as that term is defined below) for personal, family, or household purposes and not for resale.

33.     Plaintiff Laurel Vener is a Resident of Woodland Hills, California.  Plaintiff Vener purchased an iPhone 7 Plus (a Relevant Cellular Device as that term is defined below) for personal, family, or household purposes and not for resale.

**B.     <u>Defendant</u>**

34.     Defendant Qualcomm is a Delaware corporation with a principle place of business at 5775 Morehouse Drive, San Diego, California 92121.  Through its two main business segments, Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL"), Qualcomm develops, designs, licenses, and markets its digital communications products and services worldwide.  QCT engages in equipment sales, is a wholly-owned subsidiary of Qualcomm, and is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm.  QTL is also a wholly-owned subsidiary of Qualcomm and grants licenses or otherwise provides rights to use portions of Qualcomm's patent portfolio.

35.     Qualcomm has many offices and employees in this District, including in San Francisco, Santa Clara, and Alameda counties.  Qualcomm regularly conducts business in this District, and many of its licensees are also located in this District.

# V.    FACTUAL ALLEGATIONS

## A.    Standards, Patents, and FRAND Obligations

36.    Standards are the backbone of modern cellular networks.  Standards ensure that different devices will work on geographically disbursed networks.

37.    Modem chipsets (also called "chips," "chipsets," or "baseband processors") are the components that allow a cellular device to communicate on a cellular network.  To ensure that the many different devices connecting to cellular networks can communicate smoothly, cellular network carriers (such as Verizon, Sprint, and AT&T), chipset manufacturers (such as Qualcomm), and cellular device manufacturers (such as Apple and Samsung), established standard setting organizations ("SSOs") to create standards and technical specifications.  Relevant SSOs include the Institute of Electrical and Electronic Engineers ("IEEE"), the European Telecommunications Standard Institute ("ETSI"), and the International Telecommunications Union ("ITU").

38.    After a standard is adopted, participants may become "locked in" to that standard due to substantial switching costs associated with substituting a different technology.

39.    Another potential downside of standards arises where a standard incorporates patented technology.  In such cases, the patent is a standard-essential patent ("SEP").  The SEP holder may engage in "patent hold-up" by demanding excessive royalties once companies are locked into a standard.  In addition, "royalty stacking" occurs when a standard implicates multiple patents.  By "stacking" these royalty payments on top of each other the SEP holder inflates the cost of the product to the consumer.  One 2014 working paper estimated that patent royalties could potentially exceed $120 for a hypothetical $400 smart phone—an amount almost equal to that of the device's components.[1]

40.    To alleviate such potential problems, before finalizing a standard, an SSO will ask SEP holders to disclose their patents and commit to license SEPs on fair, reasonable, and non-

---

[1] Ann Armstrong et al., *The Smartphone Royalty Stack: Surveying Royalty Demands for the Components Within Modern Smartphones* (May 29, 2014) (working paper), *available at* https://www.wilmerhale.com/pages/publicationsandnewsdetail.aspx?NewsPubId=17179872441.

discriminatory ("FRAND" or "RAND") terms.  If a patent holder refuses to make such a commitment, SSOs will substitute the technology in the standard with another competing technology.

41.    One goal of FRAND obligations is to prevent SEP holders from wielding control over essential technology and restricting competition, development, and research related to the standard.  Because SEP holders benefit from license fees and royalties they gain from cooperating with an SSO, they generally agree to FRAND terms.

42.    In a suit against Qualcomm, the United States Court of Appeals for the Third Circuit noted:

> [A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the patent is incorporated in a standard.  Firms may become locked in to a standard requiring the use of a competitor's patented technology. The patent holder's [intellectual property rights], if unconstrained, may permit it to demand supracompetitive royalties.  It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

43.    When a SEP holder agrees to FRAND terms with an SSO, implementers of the standard incorporating the patent(s) and their customers are third-party beneficiaries of that agreement.  FRAND obligations are also a critical precondition for antitrust tolerance of the industry collaboration on which standard-setting depends.

**B.    Qualcomm's Dominance and Abuse of Power in the Cellular Industry**

44.    As consumers have demanded more features, wireless standards have evolved in distinct generations.  The first generation, or "1G," was relatively slow and only supported analog voice transmissions.

45.    For the second generation, or "2G," the cellular industry developed two primary families of standards: Code Division Multiple Access ("CDMA") and global system for mobility

("GSM").  Cellular telephone service providers (also known as "carriers") operated under one standard or the other.  For example, Verizon and Spring have operated under CDMA, and AT&T and T-Mobile have operated under GSM.  CDMA and GSM are not interoperable; technology compatible with one standard cannot be used for the other.

46.     Because these standards are not interoperable, CDMA-based networks demand modem chipsets that conform to the CDMA standard, and GSM networks require modem chipsets that conform to the GSM standard.  Chipsets for one standard are not substitutes for the other, and different chipsets have different price and demand characteristics.  Consumers purchase cell phones configured to operate using the standards chosen for a particular network and are tied to that standard for use of that device.

47.     Qualcomm was a pioneer in the development of CDMA technology.  It accordingly controlled, and continues to control, the market for such technology; Qualcomm initially sold 90% of the chipsets for CDMA-compatible phones and continues to control over 80% of that market. Qualcomm also obtained many patents related to the CDMA standard.  Because of Qualcomm's patent dominance in this area, practically any company that makes CDMA products must obtain a license from Qualcomm.  Such licenses typically involve a one-time fee for access to the patent portfolio and then royalties based on the final product sold by the licensee.

48.     In the third generation, or "3G," of cellular technology, the cellular industry again developed two competing standards: Universal Mobile Telecommunications Service ("UMTS") and an improved version of CDMA.  However, even UMTS was based on CDMA, IEEE, ITU, ETSI, and other SSOs adopted UMTS after weighing potential alternatives.  Qualcomm holds essential patents that are integral to the UMTS standard, and thereby continued its royalty stream with this advance in technology.

49.     Due to CDMA's basis in all 3G wireless standards, Qualcomm is able to charge a royalty on nearly every smartphone made, whether or not the device uses chips manufactured by Qualcomm.  Since 2000, Qualcomm has reaped more than $50 billion in licensing revenues.

50.     Before finalizing the CDMA and CDMA-based standards, SSOs obtained a

commitment from Qualcomm to license its SEPs on FRAND terms. However, Qualcomm has not lived up to this commitment. As a result of Qualcomm's unreasonable royalty demands, Plaintiffs and members of the Classes have paid unreasonably high prices for cellular devices.

51.      For the fourth generation, or "4G," of cellular technology, the cellular industry adopted the Long Term Evolution of UMTS (or "LTE") standard. While LTE does not implement CDMA-based technologies, Qualcomm's patent portfolio still applies to LTE technologies. In addition, many 4G cellular devices still implement Qualcom-patented CDMA technology for backwards compatibility. Qualcomm is the sole supplier of LTE chipsets that are CDMA-compatible.

52.      Qualcomm uses its stranglehold over CDMA technology to gain a greater share of the LTE chipset market. According to the KFTC, Qualcomm's market share for LTE chipsets increased from 34.2% to 96% from 2010 to 2013. Qualcomm's market share for LTE chipsets remains above 60% today.

53.      Because of Qualcomm's monopoly power over these chipsets, it is able to impose anticompetitive licensing agreements on OEMs. Because Qualcomm has declared thousands of patents as essential to the CDMA, UMTS, and LTE standards, OEMs are forced to depend on and license Qualcomm's patent portfolio. Qualcomm further uses the fact that its patent portfolio contains non-SEPs as a mechanism to avoid licensing the whole portfolio on FRAND terms. This allows Qualcomm to charge anticompetitive royalties to its licensees.

54.      The degree to which Qualcomm's royalties are abusive is underscored by the fact that, in 2014, Qualcomm made $6.6 billion in pretax profit from royalties, compared to $3.8 billion for chipset sales.

55.      Even OEMs that purchase chipsets from Qualcomm are required to accept Qualcomm's licensing terms, including royalty rates based on the selling price of finished devices.

56.      Qualcomm further entrenches its dominance by refusing to provide SEP licenses to competing chipset manufacturers.

57.      Even where OEMs might purchase chipsets from Qualcomm's competitors, the

1  OEMs are still required to pay royalties to Qualcomm due to Qualcomm's onerous licensing

2  terms.

3      58.    As a result, Qualcomm has succeeded in imposing a royalty "tax" on virtually all

4  modern cellular devices that amounts to a percentage of the price of the entire device.  Qualcomm

5  charges a royalty rate of 5% for most CDMA products and 3.25% for LTE-based products.

6      59.    The burden of these high royalty rates is compounded by the fact that Qualcomm

7  insists on the price of the finished product, rather than the value of the licensed technology

8  component(s) at issue, being the basis on which the royalties are calculated.

9      60.    IEEE's licensing policy states that determination of a reasonable royalty rate should

10 consider "[t]he value that the functionality of the claimed invention or inventive feature . . .

11 contributes to the value of the relevant functionality of the smallest saleable Compliant

12 Implementation . . . ."  In other words, a royalty rate should be based on the value of the smallest

13 saleable component that implements an SEP; not on the final price of a finished product that

14 incorporates SEP technology.

15     61.    In order to obtain some relief from Qualcomm's supracompetitive royalties, some

16 OEMs agree to deal only with Qualcomm on the purchase of chipsets.  In a recently filed

17 complaint, Apple has alleged that Qualcomm "has conditioned billions of dollars in rebates on

18 exclusivity or de facto exclusivity from Apple."  See *Apple Inc. v. Qualcomm Inc.*, Case No. 3:17-

19 cv-00108-GPC-BGS (S.D. Cal. Jan. 20, 2017).  Such exclusivity agreements present further

20 obstacles to competitors who might attempt to challenge Qualcomm's dominance.

21     62.    The KFTC has observed that, even as total revenue in the modem chipset market

22 more than doubled between 2008 and 2015, no significant competitor has entered the market, and

23 nine modem chipset manufacturers have exited the market.  Qualcomm's share of the chipset

24 market has increased correspondingly.

25     **C.    Regulatory Action on Qualcomm's Conduct**

26     63.    Qualcomm's abusive conduct has come under scrutiny by regulatory agencies in

27 China, South Korea, Taiwan, Japan, Europe, and the United States.  Many of these authorities

28

have concluded or alleged that Qualcomm's conduct is anticompetitive and harms consumers.

64.    In July 2009, the KFTC fined Qualcomm for abusing its dominant position in the CDMA modem chipset market.  The fine, $207 million, was the largest fine in the KFTC's history.  That fine did not dissuade Qualcomm from its anticompetitive conduct, and the KFTC initiated a new investigation.  Shortly after Apple made a presentation to the KFTC in August 2016, Qualcomm suddenly refused to pay certain rebates owed to Apple due to "legal issues" stemming from Apple's interactions with the KFTC.  Qualcomm subsequently suggested that the dispute could be resolved if Apple corrected or retracted its statements, and offered to work with Apple on such corrections.  Apple did not give in to Qualcomm's demands, and the KFTC imposed a second fine on Qualcomm in December 2016—$850 million.  With this fine, the KFTC found that Qualcomm dominated the markets for CDMA and LTE chipsets and that Qualcomm anticompetitively refused to license its SEPs to competitors and forced OEMs to enter into unfair license agreements.

65.    In September 2009, the JFTC concluded that Qualcomm violated the Japanese Antimonopoly Act and ordered Qualcomm to cease its anticompetitive practices.

66.    In February 2015, China's NDRC fined Qualcomm $975 million for violating the China Anti-Monopoly Law's abuse of dominance provisions.  The fine equaled eight percent of Qualcomm's annual revenue within China for the year 2013.  Among the NDRC's findings were that Qualcomm dominated certain CDMA and LTE modem chipset and SEP licensing markets, and that barriers to entry protected such dominance.  The NDRC also concluded that, as a condition for purchasing Qualcomm's chipsets, Qualcomm anticompetitively forced OEMs to license Qualcomm's SEPs.  The NDRC also found that those license terms were unreasonable.

67.    In December 2015, the European Commission ("EC") issued two Statements of Objections against Qualcomm.  One of these alleged that Qualcomm's exclusivity agreement with a major OEM harmed modem chipset competition.  Apple has since revealed itself to be the major OEM referenced in the EC's Statements of Objections.

68.    Also in December 2015, the Taiwan Fair Trade Commission ("TFTC") notified

1    Qualcomm that it had initiated an investigation into whether Qualcomm's patent licensing

2    arrangements violate the Taiwan Fair Trade Act.

3         69.    Finally, on January 17, 2017, the United States Federal Trade Commission ("FTC")

4    filed a complaint against Qualcomm alleging that Qualcomm violated the Federal Trade

5    Commission Act by monopolizing markets for CDMA and LTE modem chipsets.

6         **D.    Qualcomm's Conduct Injured Plaintiffs and the Classes**

7         70.    Qualcomm's abuse of its monopoly power by forcing OEMs to pay

8    supracompetitive royalties has directly caused injury to Plaintiffs and the Classes in the form of

9    Plaintiffs and the Classes paying inflated prices for cellular devices than they otherwise would

10   have.

11        71.    Modem chipsets are commodity products, which are designed to comport with

12   standards that ensure they can operate on wireless networks.  Cellular devices, also commodity

13   products, incorporate modem chipsets in order to comport with the same standards for which the

14   modem chipsets are designed.

15        72.    Indirect purchasers buy cellular devices from either an OEM (such as Apple or

16   Samsung) or a reseller.  Resellers can include carriers (such as Verizon, Sprint, AT&T) and

17   electronics retailers (such as Best Buy).  Qualcomm's inflated royalty rate is based on the sales

18   price of the complete cellular device.  Therefore, Qualcomm's patent rights are bound with the

19   complete cellular devices themselves.  Even though modem chipsets may cost only $10 to $13,

20   Qualcomm's royalties can amount to multiple times that component cost smartphone.  OEMs and

21   resellers pass on most, if not all, of the excessive royalty to consumers.

22        73.    Plaintiffs and the Classes are consumers in the market for cellular devices.

23   Qualcomm's licenses and technology are essential to standards-compliant operation of cellular

24   devices, and it collects a royalty on the wholesale price of cellular devices.  Therefore, Plaintiffs

25   and Qualcomm are participants in the market for cellular devices.

26        74.    Absent Qualcomm's supracompetitive royalties, Plaintiffs and members of the

27   Classes would pay less for cellular devices.

28

# VI.    **MARKET DEFINITION**

75.    The relevant geographic market for purposes of this action is the United States and its territories.

76.    The relevant product markets are: (1) the market for CDMA and premium LTE modem chipsets (the "Modem Chipset Market") and (2) intellectual property rights associated with SEPs (the "SEP Licensing Market"). These two product markets are referred to collectively herein as the "Cellular Device Components."

77.    Qualcomm encumbers cellular devices through its licenses and related royalties (calculated as a percentage of the wholesale price of cellular devices), thereby directly participating in the market for the sale of cellular devices to Plaintiffs and Class Members.

78.    When Plaintiffs buy a cellular device, they also purchase the Cellular Device Components. Qualcomm's anticompetitive conduct is inextricably linked with Plaintiffs' injuries because it has: (1) eliminated competition and therefore been able to charge supracompetitive prices for Cellular Device Components and (2) forced OEMs to agree to licensing terms which included excessive royalties.

# VII.    **CLASS ACTION ALLEGATIONS**

79.    As used herein, "Class Period" means January 17, 2013 to the present.

80.    Plaintiffs bring this action on behalf of themselves and as a class action under 15 U.S.C. § 26 pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable, injunctive, and monetary relief under federal and California law on behalf of the following Class (the "Nationwide Class"):

> All individuals and entities in the United States, its territories, and the District of Columbia, that purchased, paid, and/or provided reimbursement for some or all of the purchase price for CDMA and/or premium LTE cellular devices ("Relevant Cellular Devices") during the Class Period. Excluded from the class are: (1) governmental entities; (2) Defendant, any parent, subsidiary or affiliate thereof; (3) Defendant's officers, directors, management, and employees and any of their immediate families; (4) any judges or justices involved in this action and any members of their immediate families or their staff; and (5) all individuals and entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant.

81.     In the alternative to the nationwide claim for monetary relief under California law, Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment (the "Damages Class") under the laws of the following states:  Arizona, Arkansas, California, Colorado, Washington D.C., Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Indirect Purchaser States").

82.     The Damages Class is defined as follows:

> All individuals and entities in an Indirect Purchaser State, that purchased, paid, and/or provided reimbursement for some or all of the purchase price for CDMA and/or premium LTE cellular devices ("Relevant Cellular Devices") during the Class Period.  Excluded from the class are: (1) governmental entities; (2) Defendant, any parent, subsidiary or affiliate thereof; (3) Defendant's officers, directors, management, and employees and any of their immediate families; (4) any judges or justices involved in this action and any members of their immediate families or their staff; and (5) all individuals and entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant.

83.     The Nationwide Class and the Damages Class are referred to herein as the "Classes."

84.     Plaintiffs reserve the right to amend the definitions of the Classes.

85.     Although Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands, if not millions, of members in each of the Classes and that the members of each of the Classes are geographically dispersed throughout the United States, its territories, and the District of Columbia, thus making joinder of all Class members impracticable.

86.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Qualcomm's building and maintaining of monopoly power, which was and is applicable to all of the members of the Classes, thereby making appropriate

1    relief with respect to the Classes as a whole.  Such questions of law and fact common to the

2    Classes include, but are not limited to:

3              a.       Whether Qualcomm possessed monopoly power over the Cellular Device

4    Components in the United States during the Class Period;

5              b.       Whether Qualcomm willfully acquired or maintained monopoly power over

6    the Cellular Device Components in the United States during the Class Period;

7              c.       Whether Qualcomm possessed monopoly power in the Modem Chipset

8    Market in the United States during the Class Period;

9              d.       Whether Qualcomm attempted to possess monopoly power in the Modem

10   Chipset Market in the United States during the Class Period;

11             e.       Whether Qualcomm possessed monopoly power in the SEP Licensing

12   Market in the United States during the Class Period;

13             f.       Whether Qualcomm attempted to possess monopoly power in the SEP

14   Licensing Market in the United States during the Class Period;

15             g.       Whether Qualcomm tied the sale of its CDMA- and premium LTE-based

16   chipsets to the purchase of license rights to its patent portfolio;

17             h.       Whether Qualcomm tied the sale of its SEPs with the purchase of its non-

18   SEPs;

19             i.       Whether Qualcomm's acquisition and maintenance of its monopoly in the

20   Cellular Device Components violated the Sherman Act, as alleged in the First Claim for Relief;

21             j.       Whether Qualcomm's acquisition and maintenance of its monopoly power

22   in the Modem Chipset Market violated the Sherman Act, as alleged in the First Claim for Relief;

23             k.       Whether Qualcomm's acquisition and maintenance of its monopoly power

24   in the SEP Licensing Market violated the Sherman Act, as alleged in the First Claim for Relief;

25             l.       Whether Qualcomm's conduct violated California's Cartwright Act, Cal.

26   Bus. & Prof Code §§ 16700, et seq., as alleged in the Second Claim for Relief;

27             m.       Whether Qualcomm's conduct violated state antitrust and consumer

28

1  competition laws and/or state consumer protection laws, as alleged in the Third and Fourth Claims

2  for Relief;

3          n.      Whether Qualcomm unjustly enriched itself to the detriment of the

4  Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the Classes to

5  disgorgement of all benefits derived by Qualcomm, as alleged in the Fifth Claim for Relief;

6          o.      Whether the conduct of Qualcomm, as alleged in this Complaint, caused

7  injury to the business or property of Plaintiffs and the members of the Classes;

8          p.      The effect of Qualcomm's unlawful conduct on the prices of Relevant

9  Cellular Devices sold in the United States and its territories during the Class Period;

10         q.      The appropriate class-wide measure of damages for the Damages Class.

11      87.     Plaintiffs' claims are typical of the claims of the members of the Classes, and

12  Plaintiffs will fairly and adequately protect the interests of the Classes.

13      88.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the

14  claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not

15  antagonistic to, those of the other members of the Classes.  Plaintiff is represented by counsel who

16  are competent and experienced in the prosecution of antitrust, unfair competition, and class action

17  litigation.

18      89.     The questions of law and fact common to the members of the Classes predominate

19  over any questions affecting only individual members, including legal and factual issues relating

20  to liability and damages.

21      90.     Class action treatment is a superior method for the fair and efficient adjudication of

22  the controversy in that, among other things, such treatment will permit a large number of similarly

23  situated persons to prosecute their common claims in a single forum simultaneously, efficiently,

24  and without the unnecessary duplication of evidence, effort, and expense that numerous individual

25  actions would engender.  The benefits of proceeding through the class mechanism, including

26  providing injured persons or entities with a method for obtaining redress for claims that it might

27  not be practicable to pursue individually, substantially outweigh any difficulties that may arise in

28

1  management of this class action.

2      91.    The prosecution of separate actions by individual members of the Classes would

3  create a risk of inconsistent or varying adjudications, establishing incompatible standards of

4  conduct for Defendants.

5                              **VIII.  <u>CLAIMS</u>**

6                         **FIRST CLAIM FOR RELIEF**

7              **Monopolization in Violation of Section 2 of the Sherman Act**

8                  **(On Behalf of Plaintiffs and the Nationwide Class)**

9      92.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

10  herein.

11     93.    Qualcomm's alleged conduct constitutes unlawful monopolization of the market for

12  Cellular Device Components, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

13     94.    Antitrust principles apply to conduct involving intellectual property in the same

14  way they apply to conduct involving other forms of property.

15     95.    With market power, a seller is able to profitably maintain supracompetitive prices

16  or subcompetitive output for a significant period of time.  A seller with monopoly power may also

17  be able to control prices and exclude competition in a given market.  Where a seller can profitably

18  raise prices without causing competing sellers to expand output and drive down prices, that seller

19  has monopoly power.

20     96.    As described herein, Qualcomm has monopoly power in the Modem Chipset

21  Market as demonstrated in three ways.  First, Qualcomm has maintained high market shares in the

22  Modem Chipset Market.  Historically, Qualcomm controlled over 90% of the CDMA modem

23  chipset market and still controls 83%.  Qualcomm also controls the LTE modem chipset market,

24  controlling over 90% of the market in the past and still controlling over 60%.  Qualcomm remains

25  the exclusive supplier of multimode CDMA-LTE chipsets that combine latest-generation LTE

26  performance with the backwards compatibility of CDMA.  Second, substantial barriers to entry

27  dissuade potential market entrants. CDMA- and LTE-based technology is not interchangeable

28

with, or substitutable for, other technologies, and implementers of this technology have become locked-in. Qualcomm's control of the SEPs underlying CDMA technology and refusal to license to competitors have further perpetuated its monopoly. Third, Qualcomm has been able to force OEMs to accept unreasonable licensing agreements as a condition for selling them modem chipsets.

97.    Qualcomm similarly has monopoly power over the SEP Licensing Market. Based on Qualcomm's commitment to supply its technology on FRAND terms, SSOs selected standards based on technology for which Qualcomm holds key patents. Qualcomm holds virtually all of the SEPs for CDMA-based technologies. Because of the essential nature of these patents, other technology cannot serve as an alternative. Qualcomm's ability to leverage its control of its patents to force OEMs to agree to unfair and unreasonable license agreements is further evidence of Qualcomm's market power over the SEP Licensing Market. OEMs are forced to agree to Qualcomm's unfair and unreasonable licensing terms because of their need to comply with standards which incorporate Qualcomm's patents.

98.    Via anticompetitive means, such as refusing to license to competitors and forcing onerous terms on OEMs, Qualcomm has acquired and maintained its market power in the Cellular Device Components described above.

99.    There is no procompetitive justification for Qualcomm's anticompetitive conduct. By agreeing to FRAND obligations to induce SSOs to use its patented technology in setting standards, Qualcomm ensured that alternative technologies were not utilized. Rather than meeting its FRAND obligations, Qualcomm has abused its monopoly power in the Cellular Device Components to force OEMs into unfair and unreasonable licenses. The unreasonable terms of such licenses include, but are not limited to, unreasonably high royalty rates that are based on the wholesale price of completed devices rather than the value of Qualcomm's contribution to such devices.

100.    As a direct result of Qualcomm's conduct, purchase prices for Relevant Cellular Devices were increased and Plaintiffs and the Classes were thereby harmed. Qualcomm's conduct

also harmed innovation and competition, which caused further harm to Plaintiffs and the Classes in the quality and price of cellular devices available to them.

### SECOND CLAIM FOR RELIEF

**Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq.**

**(On Behalf of Plaintiffs and the Nationwide Class)**

101.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

102.   During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq.  Even though the Cartwright Act does not proscribe a monopolist's solely unilateral conduct, it does reach agreements between a monopolist and its customers where the monopolist coerces customers to accept the restraint in order to obtain the subject goods or services.  Despite Qualcomm's FRAND commitments, it unilaterally imposed unreasonable royalty rates beyond what it could have obtained under FRAND terms.  Therefore, Qualcomm's conduct constitutes a "combination" under the Cartwright Act.

103.   Qualcomm's unlawful scheme of excluding competition allowed it to acquire and maintain monopoly power in the Modem Chipset Market and SEP Licensing Market.

104.   The Relevant Cellular Devices are commodity products.

105.   As a direct result of Qualcomm's conduct, purchase prices for Relevant Cellular Devices were increased and Plaintiffs and the Classes were thereby harmed.

106.   Application of California antitrust law to the Nationwide Class is appropriate because Qualcomm has its headquarters in California and subjected competitors and OEMs that reside in California to its anticompetitive conduct.  Through its unlawful scheme, Qualcomm reaped massive profits from companies doing business in California.  It is foreseeable that a substantial number of California consumers would be impacted by Qualcomm's conduct, as California is also the most populous state in the country.

**THIRD CLAIM FOR RELIEF**

**Violations of Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.**

**(On Behalf of Plaintiffs and the Nationwide Class)**

107.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

108.    Plaintiffs bring this claim on behalf of themselves, the Classes, and the public as private attorney generals pursuant to Cal. Bus. & Prof. Code § 17204.

109.    Qualcomm's conduct constitutes a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL").  Because Qualcomm's conduct constitutes violations of the Sherman Act and the Cartwright Act, Qualcomm's conduct constitutes unlawful conduct under the UCL.

110.    Qualcomm unlawfully engaged in anticompetitive conduct, including: excluding competitors by refusing to license its SEPs; entering into exclusive dealing arrangements with OEMs to exclude competitors from the market, and forcing OEMs to license its entire patent portfolio under unreasonable terms.  This conduct allowed Qualcomm to acquire and maintain its monopoly power over the Modem Chipset and SEP Licensing Markets.

111.    Qualcomm deceptively induced SSOs to use its patented technology by promising to abide by FRAND obligations.  However, after SSOs included Qualcomm's patents in their standards, Qualcomm turned its back on its FRAND obligations.

112.    As a result of Qualcomm's actions, Plaintiffs and members of the Classes were unfairly charged more for their Relevant Cellular Device purchases than they would have otherwise been.

113.    Application of California antitrust law to the Nationwide Class is appropriate because Qualcomm has its headquarters in California and subjected competitors and OEMs that reside in California to its unlawful anticompetitive conduct.  Through its unlawful scheme, Qualcomm reaped massive profits from companies doing business in California.  It is foreseeable that a substantial number of California consumers would be impacted by Qualcomm's conduct, as California is also the most populous state in the country.

114.    Pursuant to Cal. Bus. & Prof. Code. § 17203, Plaintiffs and the Classes seek restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of the UCL.

115.    Pursuant to Cal. Bus. & Prof. Code § 17204, and to prevent irreparable harm to the Plaintiffs and the Classes, Plaintiffs and the Classes also seek an order enjoining Qualcomm from continuing the pattern of unlawful conduct set forth herein.

**FOURTH CLAIM FOR RELIEF**

**Violations of State Antitrust and Restraint of Trade Laws**

**(On Behalf of Plaintiffs and the Damages Class)**

116.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

117.    In the event that the Court does not apply California law on a nationwide basis, Plaintiffs allege the following violations of state antitrust and restraint of trade laws in the alternative.

118.    Defendant Qualcomm's anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of the antitrust statutes of the following jurisdictions:  Arizona, California, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, Washington D.C., and Wisconsin (the "Antitrust Jurisdictions").

119.    During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of: Arizona's Uniform State Antitrust Act, Ariz Rev. Stat. Ann. §§ 44-1401, et seq.; the Cartwright Act, Cal. Bus. & Prof. Code § 16700, et seq.; the Iowa Competition Law, Iowa Code §§ 553.1, et seq.; the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, et seq.; Me. Rev. Stat. tit. 10, §§ 1101, et seq.; Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, et seq.; the Minnesota Antitrust Law, Minn. Stat. §§ 325D.49, et seq.; Miss. Code Ann. §§ 75-21-1, et seq.; Neb. Rev. Stat. §§ 59-

801, et seq.; the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. §§ 598A.010, et seq.; N.H. Rev. Stat. Ann. §§ 356:1, et seq.; New Mexico's Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, et seq.; N.Y. Gen. Bus. Law §§ 340, et seq.; N.C. Gen. Stat. §§ 75-1, et seq.; N.D. Cent. Code §§ 51-08.1-01, et seq.; Or. Rev. Stat. §§ 646.705, et seq.; S.D. Codified Laws §§ 37-1-3.1, et seq.; Tenn. Code Ann. §§ 47-25-101, et seq.; the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, et seq.; Vt. Stat. Ann. tit. 9, §§ 2451, et seq.; the West Virginia Antitrust Act, W. Va. Code §§ 47-18-1, et seq.; D.C. Code §§ 28-4501, et seq.; and Wis. Stat. §§ 133.01, et seq. (collectively, the "Antitrust Statutes").

120.    During the Class Period, Qualcomm's illegal conduct substantially affected commerce in the Antitrust Jurisdictions.

121.    Qualcomm unlawfully acquired and maintained monopoly power in the Modem Chipset Market and SEP Licensing Market through anticompetitive means, including by excluding competition.

122.    Despite Qualcomm's FRAND obligations, it unilaterally imposed royalty rates that were unreasonable and exceeded what it could have obtained in a true FRAND negotiation.

123.    As a direct and proximate result of Qualcomm's unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

124.    Plaintiffs and the members of the Damages Class have been injured in their business and property by reason of Qualcomm's unlawful monopolization. The Relevant Cellular Devices are commodities. Plaintiffs and members of the Damages Class have paid more for Relevant Cellular Devices than they otherwise would have paid in the absence of Qualcomm's unlawful conduct. This injury flows from that which makes Qualcomm's conduct unlawful and is of the type of injury the antitrust laws of the Indirect Purchaser States were designed to prevent.

125.    Qualcomm has profited significantly from its monopolization, as described herein. The profits Qualcomm derived from its anticompetitive conduct come and the expense, and to the detriment, of Plaintiffs and the members of the Damages Class.

126.    Plaintiffs and the members of the Damages Class therefore seek damages, including statutory damages where applicable, to be trebled or otherwise increased as permitted by applicable law, and costs of suit, including reasonable attorneys' fees, and all other forms of relief available under the Antitrust Statutes.

**FIFTH CLAIM FOR RELIEF**

**Violation of State Consumer Protection Statutes**

**(On Behalf of Plaintiffs and the Damages Class)**

127.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

128.    In the event that the Court does not apply California law on a nationwide basis, in the alternative, Plaintiffs allege violations of the consumer protection and unfair competition laws of the following jurisdictions:  Arkansas, California, Colorado, Florida, Missouri, New Mexico, New York, North Carolina, Rhode Island, South Carolina, Vermont, and Washington D.C. (the "Consumer Protection Jurisdictions").

129.    Qualcomm engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the following consumer protection and unfair competition statutes:  Ark. Code Ann. §§ 4-88-101, et. seq.; California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.; the Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, et seq.; the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq.; Mo. Rev. Stat. §§ 407.010, et. seq.; New Mexico's Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, et seq.; N.Y. Gen. Bus. Law §§ 349, et seq.; N.C. Gen. Stat. §§ 75-1.1, et seq.; R.I. Gen. Laws §§ 6-13.1-1, et seq.; the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, et seq.; Vt. Stat. Ann. tit. 9, §§ 2451, et seq.; and D.C. Code §§ 28-3901, et seq. (the "Consumer Protection Statutes").

130.    As to California, this claim is instituted pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204 to obtain restitution from Defendant for acts, as alleged herein, that violated Cal. Bus. & Prof. Code §§ 17200, et seq.

131.    Defendant has monopolized through unfair, unconscionable, and/or deceptive practices in violation of the Consumer Protection Statutes.

132.    Defendant knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Relevant Cellular Devices were sold, distributed, or obtained in the Consumer Protection Jurisdictions and took efforts to conceal its agreements from Plaintiffs and members of the Damages Class.

133.    Defendant deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendant's unlawful activities and artificially inflated prices for the Relevant Cellular Devices.  Defendant owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendant breached that duty by its silence.

134.    Plaintiffs and members of the Damages Class were not aware of Defendant's illegal conduct and were therefore unaware that they were being unfairly and illegally overcharged.

135.    There was a gross disparity of bargaining power between the parties with respect to the royalty Defendant imposed on the Relevant Cellular Devices.  Defendant had the sole power to set royalties and Plaintiffs and members of the Damages Class had no power to negotiate a lower price.

136.    Plaintiffs and members of the Damages Class also lacked any meaningful choice in purchasing Relevant Cellular Devices because they were unaware of the unlawful overcharge. There was therefore no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges.

137.    Defendant knew that its unlawful trade practices with respect to imposing royalties on Relevant Cellular Devices would have an impact on consumers in the Consumer Protection Jurisdictions and not just the Defendant's direct customers.  Defendant knew that its unlawful trade practices of imposing unreasonable royalties on Relevant Cellular Devices would have a broad impact, causing consumer class members who indirectly purchased Relevant Cellular

Devices to be injured by paying more for Relevant Cellular Devices than they would have paid in the absence of Defendant's unlawful trade acts and practices.

138.    Defendant's conduct, alleged herein, constitutes consumer-oriented deceptive acts or practices, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest in an honest marketplace in which economic activity is conducted in a competitive manner in the Consumer Protection Jurisdictions.

139.    Defendant's conduct with regard to sales of Relevant Cellular Devices, including its illegal conduct with respect to abusing its monopoly power to increase the price of Relevant Cellular Devices to supracompetitive levels and overcharging consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendant at the expense of Plaintiffs and the public.

140.    Defendant's aforementioned conduct—including the violations of Section 1 of the Sherman Act and the violations of the Antitrust Statutes, as set forth above—constituted unconscionable and deceptive acts or practices, unfair competition or practices, and unfair, unlawful, and/or fraudulent business or trade acts or practices in violation of the Consumer Protection Statutes.

141.    Defendant's unlawful conduct had the following effects:  (1) Relevant Cellular Devices price competition was restrained, suppressed, and eliminated throughout the Consumer Protection Jurisdictions; (2) Relevant Cellular Devices prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the Consumer Protection Jurisdictions; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Relevant Cellular Devices.

142.    During the Class Period, Defendant's illegal conduct substantially affected commerce and consumers in the Consumer Protection Jurisdictions.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and members of the Damages Class have suffered ascertainable injury to their money and/or property and are threatened with further injury.

143.    Defendant's conduct resulted in a gross disparity between the value received by Plaintiffs, and members of the Damages Class, and the prices they paid for Relevant Cellular Devices.

144.    Defendant's deception, including its affirmative misrepresentations and omissions likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Relevant Cellular Devices at prices set by a free and fair market.

145.    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices.  The illegal conduct alleged herein is continuing and there is no indication that Defendant will not continue such activity into the future.

146.    As to California, Defendant has been unjustly enriched as a result of its wrongful conduct and by Defendant's unfair competition.  Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

147.    Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of the Consumer Protection Statutes and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under those statutes.

### SIXTH CLAIM FOR RELIEF

### Unjust Enrichment

### (On Behalf of Plaintiffs and the Damages Class)

148.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

149.    Qualcomm has and will continue to be unjustly enriched as a result of its unlawful conduct.

150.    At a minimum, Qualcomm has been unjustly enriched by, and benefitted from, the

1    receipt of unlawfully inflated profits related to the Relevant Cellular Devices.

2        151.    It would be inequitable for Qualcomm to retain any of the ill-gotten gains resulting

3    from the overpayments made from Relevant Cellular Devices by Plaintiffs and the members of the

4    Damages Class.

5        152.    Plaintiffs and the members of the Damages Class are entitled to the amount of

6    Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.

7    Plaintiff and the members of the Damages Class are entitled to the establishment of a constructive

8    trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class

9    may make claims on a pro rata basis.

10        153.    Plaintiffs and the members of the Damages Class seek disgorgement of all profits

11    resulting from such overpayments and establishment of a constructive trust from which Plaintiffs

12    and the members of the Damages Class may seek restitution.

13                        **IX.    PRAYER FOR RELIEF**

14        WHEREFORE, Plaintiffs pray:

15        A.    That the Court determine that this action may be maintained as a class action under

16    Rule 23(a), -(b)(2) and -(b)(3) of the Federal Rules of Civil Procedure and direct that reasonable

17    notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be

18    given to members of the Classes;

19        B.    That the Court adjudge and decree that the conduct alleged herein constitutes a

20    violation of Section 2 of the Sherman Act;

21        C.    That the Court adjudge and decree that the conduct alleged herein is a violation of

22    the state antitrust and unfair competition laws cited herein, state consumer protection laws cited

23    herein, and constitutes unjust enrichment of Defendants;

24        D.    That the Court award Plaintiffs and the Classes treble damages to the extent such

25    laws permit;

26        E.    That the Court award Plaintiffs and the Classes attorneys' fees and costs as well as

27    pre-judgment and post-judgment interest as permitted by law;

28

F.     That Defendant and its successors, assigns, parents, subsidiaries, affiliates and transferees, and its officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendant, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the conduct alleged herein, or adopting any practice, plan, program or design having a similar purpose or affect in restraining competition; and

G.     That the Court award Plaintiffs and the members of the Classes such other and further relief as may be deemed necessary and appropriate.

## X.     DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on all matters so triable.

Dated: March 1, 2017                              Respectfully submitted,

By:   */s/ KC Maxwell*
KC Maxwell (CA # 214701)
David S. Wakukawa (CA # 262546)
BROWNE GEORGE ROSS LLP
101 California Street, Suite 1225
San Francisco, California  94111
Telephone: (415) 391-7100
Facsimile: (415) 391-7198

Daniel E. Gustafson (MN # 202241)
Daniel C. Hedlund (MN # 258337)
Michelle J. Looby (MN # 0388166)
Daniel J. Nordin (MN # 0392393)
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota  55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email:  dgustafson@gustafsongluek.com
        dhedlund@gustafsongluek.com
        mlooby@gustafsongluek.com
        dnordin@gustafsongluek.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Eric D. Barton (MO # 53619)
Tyler W. Hudson (MO # 53585)
David Barclay (MO # 67256)
WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, Missouri  64112
Telephone: (816) 701-1100
Facsimile:  (816) 531-2372
Email:  ebarton@wagstaffcartmell.com
        thudson@wagstaffcartmell.com
        dbarclay@wagstaffcartmell.com

Counsel for Plaintiffs and the Proposed Classes